**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| ROGELIO REYNA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-03-1757-M |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| and | ) | Consolidated with |
| | ) | |
| ROGELIO REYNA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-04-221-M |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>ORDER</u>

These consolidated medical malpractice actions were tried to the Court on April 11, 12, and

13, 2005.[1] Plaintiff Rogelio Reyna ("Mr. Reyna") advances three claims against Defendant United

States of America (the "government"), all of which arise from a cataract surgery performed at the

Oklahoma City Veterans Administration Medical Center ("VAMC"). Specifically, Mr. Reyna

---

[1] Plaintiff Rogelio Reyna was represented by Mike Markey of Wichita Falls, Texas, and Defendant United States of America was represented by K. Lynn Anderson and Steven K. Mullins, Assistant United States Attorneys, appearing on behalf of Robert G. McCampbell, United States Attorney for the Western District of Oklahoma.

During the trial, Mr. Reyna called the following witnesses: Dr. Andrew A. Dahl; himself; Maria Barrera; Dr. Gemini Schuessler; and Dr. Roland A. Walters, III. The government called: Dr. Sumit Nanda; Dr. Charles P. Bogie, III; Sherri D. Walton, R.N.; Dr. Alan A. Norman; and Dr. James Berry Wise. The Court admitted Joint Exhibits 1 through 13 and the government's Exhibit 1 without objection.

claims: (1) VAMC doctors failed to provide him with adequate informed consent prior to his cataract surgery; (2) VAMC doctors acted negligently in performing cataract surgery on his left eye, said negligence resulting in or contributing to his permanent loss of vision in that eye; and (3) VAMC doctors acted negligently in providing post-operative treatment for his left eye, said negligence resulting in or contributing to his permanent loss of vision in that eye.  Having heard the testimony of the witnesses, reviewed the exhibits admitted into evidence, and considered the entire matter, and pursuant to Federal Rule of Civil Procedure 52(a), the Court now makes the following findings of fact and conclusions of law.

I.      Findings of Fact

      A.      Mr. Reyna's Background and Health/Medical History

1.      Mr. Reyna was honorably discharged from the United States Army in 1980, retiring with a 40% disability rating attributable to a non-combat injury to his leg and diabetes mellitus.

2.      Since his separation from the Army, Mr. Reyna's health problems have increased in both number and severity.  As of September 1, 1999, Mr. Reyna suffered from obesity, diabetes mellitus, ischemic heart disease with hypertension, abnormally low left ventricular ejection fraction, and nerve paralysis.  He also had experienced at least one ischemic infarct, and had been observed during a post-traumatic stress disorder examination to have a poor memory.

3.      In or around 1994, Mr. Reyna's vision began to deteriorate due to the presence of cataracts in both eyes.  VAMC records reveal that in March of 1994, cataract surgery was discussed with Mr. Reyna as an option for improving his vision.  For reasons unknown, Mr. Reyna rejected the recommendation that he undergo cataract surgery.  Mr. Reyna again declined cataract surgery in August of 1994, in April of 1996, and in September of 1997.

4.     On May 13, 1999, during a routine eye examination conducted by Dr. Charles P. Bogie, III ("Dr. Bogie"), Mr. Reyna finally agreed to undergo cataract surgery on his left eye.  At that time, the vision in Mr. Reyna's left eye was measured at 20/400.  The vision in Mr. Reyna's right eye was measured at 20/60.

B.     Informed Consent

5.     In the course of discussing cataract surgery with Mr. Reyna during the May 13, 1999 eye examination, Dr. Bogie advised Mr. Reyna of the primary risks and benefits of the surgery.  He advised Mr. Reyna, for example, that cataract surgery was likely to improve his vision; he advised Mr. Reyna that although cataract surgery is very successful in most cases, it does carry risks, like any surgery; and he advised Mr. Reyna that the risks could be separated into three categories: (1) infection; (2) various "bad things" that can happen during the course of the surgery; and (3) other "bad things" that can occur following cataract surgery.  Dr. Bogie specifically informed Mr. Reyna that "loss of vision" could result from cataract surgery.  Finally, Dr. Bogie informed Mr. Reyna that cataract surgery is an elective procedure – that it is not required.

6.     Dr. Bogie did not inform Mr. Reyna that his surgery would be performed by a resident physician, nor did Dr. Bogie inform him of the identity of that resident.

7.     Dr. Bogie scheduled Mr. Reyna's cataract surgery for September 1, 1999.  Mr. Reyna was directed, however, to report to the VAMC one day early to complete paperwork and to undergo other pre-operative procedures.

8.     Mr. Reyna reported to the VAMC as directed on August 31, 1999.  On that date, Mr. Reyna signed a document entitled "Request for Administration of Anesthesia and for Performance of Operations and Other Procedures" ("Informed Consent Form").  The Informed Consent Form

3

provides, in pertinent part: "I understand the nature of the proposed procedure(s), attendant risks involved, and expected results, as described above, and hereby request such procedure(s) be performed." Joint Ex. 10. The Informed Consent Form does not identify any specific risks of cataract surgery. Dr. Darin Haivala ("Dr. Haivala") signed the Informed Consent Form as the "counseling physician," but it is unclear whether Dr. Haivala actually met with Mr. Reyna, as Mr. Reyna does not recall meeting Dr. Haivala at any time, and neither Dr. Haivala nor any other witness testified that Dr. Haivala in fact personally met with Mr. Reyna. However, the VAMC's standard procedure is to have a VAMC doctor meet with the patient prior to surgery and ask him if he has been advised of all the risks, benefits, and alternatives to surgery before the Informed Consent Form is signed.

9.      Although Mr. Reyna testified that he was never informed that cataract surgery carried with it a risk of blindness, the Court finds that he would not have declined to undergo cataract surgery on his left eye had he been advised of the possibility that he could lose his vision. While Mr. Reyna testified that knowledge of the risk of blindness would have made him "think twice" about the surgery, he also testified that he will likely undergo cataract surgery on his right eye in the near future despite his fear of what may happen as a result of the surgery.

10.     Mr. Reyna was not informed that a resident physician would perform his cataract surgery. Mr. Reyna testified that he would not have consented to an "intern" performing his surgery, but the Court finds that he clearly did not understand the level of experience and the qualifications of resident physicians who, like Dr. Schuessler, had graduated from medical school, completed a one-year internship, and performed several dozen cataract surgeries at the time of his procedure.

The Court finds that had he been so advised, Mr. Reyna would not have declined to undergo the surgery.

11.     Before his September 1, 1999 cataract surgery, Mr. Reyna was informed on at least one occasion that blindness could result from the surgery.  He was specifically informed of that risk during his May 13, 1999 eye examination with Dr. Bogie, and he was likely informed of the risk during his two eye examinations at the VAMC in 1994, his eye examination at the VAMC in 1996, and his eye examination at the VAMC in 1997, at which times he declined to undergo cataract surgery.

C.     September 1, 1999 Cataract Surgery

12.     On the afternoon of August 31, 1999, Dr. Schuessler, the Chief Ophthalmology Resident at the VAMC at the time (who had already performed approximately 100 cataract surgeries in the course of her residency), reviewed Mr. Reyna's Informed Consent Form and the other pre-operative paperwork completed by Dr. Haivala earlier in the day.  Dr. Schuessler noted that the cataract in Mr. Reyna's left eye was unusually dense, rating a 3+ or 4+ on a scale of 1+ (least dense) to 4+ (most dense).  Because of the density of the cataract, and the attendant difficulty of attempting to remove such a cataract, Dr. Schuessler elected to perform the operation herself, rather than assigning one of the less-experienced VAMC residents.

13.     On the morning of September 1, 1999, before the surgery, Dr. Schuessler introduced herself to Mr. Reyna and asked him if he had any questions or concerns about the surgery.  Mr. Reyna responded that he did not.

14.     Also before the surgery, Dr. Schuessler asked Dr. Roland A. Walters, III ("Dr. Walters"), a board certified ophthalmologist and the attending surgeon for Mr. Reyna's procedure,

to be prepared to actively assist her because Mr. Reyna's cataract was so dense, and because she feared the procedure would be more difficult as a result.

15.     Finally, Mr. Reyna was brought into the operating room and prepped for his surgery – a drape was placed over his body, his surrounding skin was prepped, and a topical antibiotic was applied to his left eye.  Dr. Schuessler took her position at one of the oculars on the bi-ocular microscope used during the surgery, and Dr. Walters took his position at the other.  Dr. Alan A. Norman ("Dr. Norman"), a resident physician at the VAMC, Nurse Sherri D. Walton ("Nurse Walton"), one other nurse, and perhaps one or two additional resident physicians assisted in or observed the procedure.

16.     The surgical procedure performed on Mr. Reyna's left eye is called a "phacoemulsification with posterior chamber intraocular lens."  In summary, the procedure involves the following six steps: (1) the surgeon first makes an incision of approximately 2-4 millimeters in length on the edge or periphery of the cornea; (2) the surgeon then performs an anterior capsulotomy, which involves making a circular incision on the front (or anterior) of the posterior chamber or capsule that encloses the lens; (3) once the circular "cap" on the capsule is removed, forming a "lens bag," the surgeon inserts through the incision and into the lens bag a device called a phacoemulsification tip; (4) fluid is injected into the lens bag by the phacoemulsification tip in order to enlarge the bag and increase the amount of operating space for the procedure; (5) the phacoemulsification tip then produces ultrasonic sound waves that break up the cataract (which includes the natural lens of the eye) into tiny pieces, which are suctioned out of the lens bag through the tip; (6) a synthetic "intraocular" lens, usually made of plastic, silicone, or some other polymer, is then introduced into and secured in the lens bag to take the place of the natural lens.

6

17. Dr. Schuessler performed the first five steps of the surgical procedure without incident; the first complication occurred during the attempted implantation of the intraocular lens. Following the removal of Mr. Reyna's cataract, Dr. Schuessler attempted to implant a Star brand, silicone intraocular lens in Mr. Reyna's lens bag.  She injected the folded lens into the lens bag by means of a syringe-like device that was inserted through the initial incision.  In the process, one of the two "haptics" or arms of the intraocular lens, which are used to hold the lens in place inside the lens bag, tore the posterior of the lens bag, causing vitreous (a jelly-like substance that fills the center and rear of the eye) to enter the anterior chamber, in the front of the eye.[2] Dr. Schuessler then commenced an anterior vitrectomy, cutting off and removing the portion of the vitreous that had entered the front of the eye and preventing further vitreous migration.

18. Because of the vitreous migration, Dr. Schuessler and Dr. Walters jointly decided to remove the just-inserted intraocular lens and to attempt a re-implantation at a later time.  At this point, they were presented with three options: (1) the initial incision could be widened to approximately 6 millimeters in length – the approximate diameter of the intraocular lens – and the intraocular lens could be removed in one piece; (2) the size of the incision could be left the same, and the lens could be cut in half while still inside the anterior chamber of the eye, then removed one half at a time through the smaller incision; or (3) the intraocular lens could be re-folded and removed in one piece through the smaller incision.

19. Drs. Schuessler and Walters ultimately decided to remove the intraocular lens by way of the second option, by cutting it in half with a pair of scissors, in order to keep the initial incision

---

[2] Mr. Reyna's medical expert, Dr. Andrew A. Dahl, testified that a capsular tear resulting in vitreous migration is a recognized complication of cataract surgery and does not necessarily constitute negligent conduct.

as small as possible to reduce the risk of infection.  They rejected the third option because re-folding an intraocular lens inside the eye is difficult and potentially more traumatic to the eye than bisecting the intraocular lens.  Dr. Walters asked Dr. Schuessler if the VAMC had a pair of Chu Scissors, which are specifically designed for cutting intraocular lenses.  When advised that Chu Scissors were not available at the VAMC, Dr. Walters suggested that Dr. Schuessler attempt the procedure with a pair of long-bladed Vannas Scissors.

20.    Dr. Schuessler then attempted to bisect the intraocular lens with the Vannas Scissors, a procedure that she had never previously performed.  Dr. Schuessler was unsuccessful, at least in part, because her view of the intraocular lens was obscured by blood, which had begun to form in the anterior chamber of Mr. Reyna's left eye as a result of a tear in his iris (also known as iridodialysis).[3]  Dr. Schuessler's efforts to cut the intraocular lens only further irritated Mr. Reyna's iris, producing more blood and further obscuring her view.  Dr. Walters, then, took over from Dr. Schuessler and attempted to cut the lens himself.  He was equally unsuccessful, however, experiencing a similar problem with iris irritation and bleeding.

21.    Having decided to abandon the lens-cutting option, Drs. Schuessler and Walters focused on increasing the size of the initial incision and removing the lens in one piece.  Dr. Walters successfully did so.

22.    Once the intraocular lens had been removed, Dr. Schuessler reassumed her position as the operating surgeon and completed the vitrectomy that she started earlier, removing the

---

[3]    The iris tear likely resulted from either a crimp in one of the haptics rubbing against the iris or the insertion of the Vannas Scissors into the eye.

remaining vitreous and blood from the anterior chamber before closing the initial incision with four sutures.

23.     Immediately after the surgery, Dr. Schuessler spoke to Mr. Reyna and explained that she was unable to implant the intraocular lens as planned.

24.     Dr. Andrew A. Dahl ("Dr. Dahl"), Mr. Reyna's medical expert, criticized the surgery for two reasons.   First, he criticized the VAMC doctors' decision to cut the intraocular lens as opposed to removing it in one piece.   Specifically, he testified that it is extremely difficult to successfully bisect an intraocular lens, and particularly so for a relatively inexperienced surgeon like Dr. Schuessler.   Second, he criticized the decision to cut the intraocular lens with a Vannas Scissors, which he described as a rather delicate instrument designed primarily to cut the iris, which is much softer than a silicone intraocular lens.

25.     Dr. Dahl testified that the decision to cut the already implanted intraocular lens in Mr. Reyna's left eye, and to do so with a Vannas Scissors, triggered a series of events that culminated in Mr. Reyna suffering a Central Retinal Artery Occlusion ("CRAO"), a blockage or compression of the central retinal artery that results in a loss of blood flow to the retina and, eventually, irreversible blindness in the affected eye.   He further testified that these decisions fall outside the national standard of care that applies to ophthalmologists practicing in Oklahoma.

26.     Dr. Dahl testified that in his opinion, Mr. Reyna's CRAO, which occurred approximately six months after his cataract surgery, was caused by elevated intraocular pressure, also known as glaucoma.[4]   When asked to explain *how* Mr. Reyna developed glaucoma, however,

---

[4]     Glaucoma results from an imbalance between the production of aqueous humor, the clear fluid that circulates through the anterior portion of the eye, and drainage of the aqueous humor out of the eye.   When the rate at which aqueous humor is produced exceeds the rate at which

Dr. Dahl was unable to do so with any degree of certainty.  He testified, for example, that the trabecular meshwork (a series of canals through which fluid drains out of the anterior chamber of the eye) in Mr. Reyna's left eye could have been scarred as a result of Mr. Reyna's torn iris, somehow leading to elevated pressure inside the eye.  Second, he testified that hemorrhage caused by the torn iris may have caused Mr. Reyna to develop "Ghost Cell Glaucoma."  Third, he testified that the steroid drops prescribed to reduce the inflammation in Mr. Reyna's eye could have caused "Steroid Glaucoma."  Fourth, he testified that the trabecular meshwork could have been clogged by inflammatory debris as a result of the surgery, thereby leading to secondary glaucoma.  Dr. Dahl could not say that any one of these four possibilities was more likely than any other to have caused Mr. Reyna's glaucoma and, later, his CRAO.

27.    Dr. Sumit Nanda ("Dr. Nanda"), the first of the government's medical experts – an expert on retinal disease – testified that he has never heard of a case where glaucoma caused a CRAO.  He testified, more specifically, that although *external* pressure on the eye can lead to an intraocular pressure so high that the central retinal artery may occlude, the elevated intraocular pressure caused by glaucoma, which is strictly *internal* to the eye, cannot.  The reason for this is as follows: (1) to occlude the central retinal artery, one's intraocular pressure would have to exceed the blood pressure in the central retinal artery; (2) the blood pressure in one's central retinal artery is essentially the same as one's systolic blood pressure; (3) because one's systolic blood pressure, and hence the blood pressure in the central retinal artery, normally exceeds 100 millimeters of mercury, and the intraocular pressure rarely exceeds even 70 millimeters of mercury in glaucoma

---

aqueous humor drains out of the eye, the pressure inside the eye increases.

patients, glaucoma-based intraocular pressure cannot exceed the blood pressure in the central retinal artery, and therefore cannot occlude the artery.

28.     Dr. Nanda testified that in his opinion, Mr. Reyna's CRAO was caused by an embolus – typically a piece of cholesterol plaque, but potentially some other object – that enters the blood stream with the potential to lodge itself in an artery and cut off blood flow.  He testified that Mr. Reyna's background of diabetes, high blood pressure, heart disease, ischemic infarcts, and abnormally low left-ventricular ejection fraction, all support the occurrence of an embolism, the process whereby an embolus actually blocks an artery.

29.     Dr. Nanda also testified that Mr. Reyna's post-operative medical records do not support a finding that he suffered from an intraocular pressure sufficiently high to occlude his central retinal artery.  As the basis for that conclusion, Dr. Nanda noted that an extremely high intraocular pressure, such as would be required to occlude the central retinal artery, would ordinarily be accompanied by a hazy cornea, a thinness in the space between the iris and cornea, pain, and nausea, none of which are reflected in Mr. Reyna's post-operative medical records.

30.     Dr. James Berry Wise ("Dr. Wise"), the government's second medical expert – an expert on glaucoma – testified, like Dr. Nanda, that he has never heard of a case where glaucoma caused a CRAO.  He also testified, like Dr. Nanda, that glaucoma *cannot* cause a CRAO.  Dr. Wise's explanation for this conclusion differs somewhat from Dr. Nanda's.  Specifically, Dr. Wise testified that fluid production in the anterior chamber of the eye automatically decreases, and eventually stops altogether, once the intraocular pressure reaches a certain point, a point below that which is necessary to occlude the central retinal artery.  Dr. Wise testified that he has never seen an intraocular pressure in excess of 70 millimeters of mercury, and that the blood pressure in the central

retinal artery, which he testified is slightly lower than one's systolic blood pressure, always significantly exceeds the intraocular pressure.[5]

31.     Dr. Wise testified that Ghost Cell Glaucoma, also called Ghost Red Cell Glaucoma, could not have caused Mr. Reyna's CRAO.  According to Dr. Wise, Ghost Red Cell Glaucoma involves excess blood in the rear of the eye accumulating and thereby elevating intraocular pressure. He testified that if Mr. Reyna had Ghost Red Cell Glaucoma, the VAMC doctors who examined him post-surgery would have observed the excess blood in his eye, and because they did not, Ghost Red Cell Glaucoma can be ruled out as a potential cause of Mr. Reyna's CRAO.

32.     Dr. Wise also testified that Steroid Glaucoma could not have caused Mr. Reyna's CRAO.  He testified that steroid drops, such as those that were prescribed for Mr. Reyna following his surgery, *can* potentially lead to Steroid Glaucoma, but that the intraocular pressure resulting from Steroid Glaucoma would not have exceeded 40 millimeters of mercury, far below that which is necessary to occlude the central retinal artery.

33.     Dr. Wise testified that Mr. Reyna's post-operative medical records do not indicate that he suffered from glaucoma until *after* his CRAO.

34.     Dr. Wise testified that in his opinion, Mr. Reyna's CRAO should be attributed to an embolus, as Mr. Reyna was at very high risk for the problem as a result of his high blood pressure, diabetes, and heart problems.

---

[5]     Both Dr. Dahl and Dr. Wise testified that the blood pressure in Mr. Reyna's central retinal artery would have been somewhat lower than that of most people as a result of Mr. Reyna's poor circulation.  Neither doctor, however, offered an opinion as to what the blood pressure in the central retinal artery may have been.

35.     Finally, Dr. Wise testified that the VAMC doctors' decisions to cut the intraocular lens, and to do so with the Vannas Scissors, were neither inappropriate nor outside the national standard of care that applies to ophthalmologists practicing in Oklahoma.   In support of that conclusion, Dr. Wise testified that it is in the best interest of the cataract patient for the surgeon to make a small initial incision, and to refrain from enlarging that incision if possible, to decrease the risk of infection and other complications in the eye.   He also testified that it is standard practice to attempt to bisect an intraocular lens and remove it in halves, rather than enlarging the initial incision and removing the lens in one piece.

D.     Post-Operative Treatment

36.     Mr. Reyna's first post-operative eye examination took place the day after his cataract surgery, on September 2, 1999.   Dr. Schuessler examined Mr. Reyna, observing that his left eye was aphakic (without a lens), that the cornea in his left eye was swollen,[6] that his visual acuity was "hand motion,"[7] that the intraocular pressure of his left eye, measured via "tension by applanation," was normal (measuring 19, within the normal range of approximately 10-21), that his pupil was round,[8]

---

[6]     Dr. Schuessler testified that Mr. Reyna's cornea was swollen because his cataract had been unusually dense, and the cataract took such a long time to remove.

[7]     Visual acuity is described on a continuum.   If a patient is capable of seeing clearly, at least with the aid of glasses or contact lenses, his or her visual acuity may be described with a typical eyeglass or contact lens prescription.   If, on the other hand, the patient is incapable of seeing clearly, even with the aid of glasses or contacts, three descriptive terms are used to describe visual acuity.   The first of these three terms is "counting fingers," where the patient is capable of perceiving the fingers on a hand at a particular distance.   The second is "hand motion," which means that the patient, while unable to count fingers, is nevertheless capable of perceiving the movement of a hand at a particular distance.   The third of these three terms is "light perception," which means that the patient is unable to count fingers or perceive hand movement, but remains capable of distinguishing light and dark.

[8]     Dr. Schuessler testified that the pupil will appear distorted, as opposed to round, if an iris tear is significant.   The fact that Mr. Reyna's pupil appeared round, therefore, indicates that

that the anterior chamber of his left eye was "quiet and deep,"[9] that his eye was "Seidel negative," meaning that there was no leakage from his wound, and that his "red reflex" was normal, meaning that there was no sign of retinal detachment.  Dr. Schuessler prescribed two types of medication and scheduled Mr. Reyna's next appointment for one week later.

37.    Mr. Reyna's second post-operative eye examination took place on September 9, 1999, eight days after his cataract surgery.  Dr. Schuessler again examined Mr. Reyna, observing that there was no bleeding (or "hyphema") in his left eye, that his left eye was still aphakic, that the cornea in his left eye was still swollen, that his visual acuity was still "hand motion," that the intraocular pressure of his left eye, measured via tension by applanation, was still normal (measuring 16), that his pupil was still round, that the anterior chamber of his left eye was still quiet and deep, that his eye was still Seidel negative, and that his red reflex was still normal.  Dr. Schuessler told Mr. Reyna to taper his medication and scheduled his next appointment for five weeks later.

38.    Mr. Reyna's third post-operative eye examination took place on October 14, 1999, approximately six weeks after his surgery.  Dr. Schuessler again examined Mr. Reyna, observing that his left eye was still aphakic, that the cornea in his left eye was still swollen, but less so than it had been previously, that his visual acuity was still "hand motion," that the intraocular pressure of his left eye, measured via tension by applanation, was still normal (measuring 12), that the anterior chamber of his left eye was still quiet and deep, and that his retina appeared normal, though his cornea was somewhat hazy.  Dr. Schuessler told Mr. Reyna to continue on his medication, noted that

---

his iris tear was minor.

[9]      While the precise meaning of this descriptive phrase was not explained in lay terms, it is nevertheless clear that the description denotes normalcy.

a new intraocular lens would be implanted as soon as Mr. Reyna's cornea cleared, and scheduled his next appointment for six weeks later.

39.     Mr. Reyna's fourth post-operative eye examination took place on December 2, 1999, approximately twelve weeks after his surgery.  This time, Dr. Norman examined Mr. Reyna, as Dr. Schuessler had completed her residency at the VAMC at the end of October, 1999.  Dr. Norman observed that Mr. Reyna's left eye was aphakic, that his visual acuity was now "light perception,"[10] and that his retina was attached.  Dr. Norman did not check the intraocular pressure of Mr. Reyna's left eye because his eye was "in too much pain."  Joint Ex. 5.  Dr. Norman noticed that Mr. Reyna's sutures were tight and removed two of the four sutures.  He scheduled a follow-up appointment for December 20, 1999 to remove the remaining sutures.

40.     Mr. Reyna failed to appear at the VAMC for his scheduled appointment on December 20, 1999, and no subsequent appointment was scheduled.

41.     On February 2, 2000, Mr. Reyna fell, breaking his kneecap.  He arrived at the VAMC for treatment, and while being treated for his knee injury, he asked to see an ophthalmologist because he had been experiencing a "scratchy, sharp pain . . . [with] associated headache."  Joint Ex. 7.  Dr. Norman examined Mr. Reyna and discovered that one of his sutures had broken.  Dr. Norman removed the broken suture and prescribed antibiotic ointment for Mr. Reyna's eye.  Additionally, Dr. Norman noted that Mr. Reyna's anterior chamber was "deep," but that the intraocular pressure of his left eye, measured via tension by applanation, was abnormally high, between 29 and 30.  Dr.

---

[10]     Dr. Norman testified that the distinction between "hand movement" and "light perception" is not necessarily significant, but further testified that the "light perception" description could be an indication that Mr. Reyna's vision had in fact worsened since his previous visit.

Norman prescribed eyedrops to reduce the intraocular pressure and scheduled a follow-up appointment for the following day.

42.     Mr. Reyna appeared as directed for his February 3, 2000 appointment with Dr. Norman.  Dr. Norman observed that Mr. Reyna was experiencing moderate pain in his left eye, that the intraocular pressure of his left eye, measured via tension by applanation, was still elevated, at 32, that his visual acuity had deteriorated to "no light perception," meaning that he had no vision at all in his left eye, and that his left eye showed signs of a CRAO: neovascularization (growth of new blood vessels) of the iris, retinal pallor (paleness), and a "cherry red spot" in the middle of the retina.  Dr. Norman prescribed eye drops for the elevated intraocular pressure and arranged for Mr. Reyna to undergo an embolic work-up to determine whether an embolus caused the CRAO.

43.     The embolic work-up did not definitively reveal whether an embolus caused Mr. Reyna's CRAO.[11]

44.     Dr. Dahl testified that in his opinion, the post-operative treatment provided to Mr. Reyna fell outside the applicable standard of care.  First, Dr. Dahl criticized the VAMC doctors' failure to determine Mr. Reyna's "best corrected vision" by using the "+12 and pin hole" test.  He testified that this test is typically used for patients who are aphakic.  He did not testify, however, that the failure to perform this test caused or contributed to Mr. Reyna's CRAO in any way.

45.     Dr. Schuessler testified that she did not perform the "+12 and pin hole" test because of Mr. Reyna's corneal swelling, which would have distorted the results of the test.

---

[11]     Though he argues that Mr. Reyna's CRAO is attributable to glaucoma, Dr. Dahl testified that in any given case, the failure to find an embolus post-CRAO does not necessarily mean that an embolism could not have caused the CRAO.  Dr. Dahl also testified, consistently with all of the doctors who testified in this case, that emboli are the most common cause of CRAOs, accounting for approximately three-quarters of them.

16

46.     Second, Dr. Dahl criticized the VAMC doctors' failure to record Mr. Reyna's feelings and experiences regarding his left eye (e.g., whether Mr. Reyna was in pain, whether in his opinion his vision was getting better or worse, etc.) in their written records.  The absence of such information, according to Dr. Dahl, makes it difficult to determine exactly what was happening with Mr. Reyna's eye.

47.     Third, Dr. Dahl criticized the number and frequency of Mr. Reyna's post-operative examinations.  He testified that a patient who has experienced complications of the sort experienced by Mr. Reyna should have been examined earlier than one week post-operatively for his second appointment, that Mr. Reyna's third appointment should have been scheduled sooner than five weeks after the second, and so forth.  In essence, Dr. Dahl testified that the progress of Mr. Reyna's left eye should have been monitored more closely than it was.

48.     Dr. Schuessler testified that the frequency of Mr. Reyna's first three post-operative examinations was dictated by the fact that her first, and then her second, post-operative examination of Mr. Reyna revealed no serious or continuing problems with his left eye.  She noted that Mr. Reyna was not in pain, that his intraocular pressure was normal, and that his corneal swelling was improving.

49.     Dr. Wise testified that the frequency of Mr. Reyna's post-operative examinations fell within the applicable standard of care based on the absence of any serious or continuing problems with his left eye.  He further testified that the first indication of any problem was on December 2, 1999, during Mr. Reyna's fourth post-operative appointment.  Dr. Wise testified that he would have been concerned about the apparent deterioration of Mr. Reyna's visual acuity from "hand movement" to "light perception," but emphasized that he would have been reassured by the fact that

17

Mr. Reyna's retina appeared normal – he testified that Dr. Norman would not have been able to see the retina clearly if Mr. Reyna had been suffering from glaucoma.

50.     Dr. Dahl's fourth criticism has to do with Dr. Norman's failure to measure Mr. Reyna's intraocular pressure on December 2, 1999.  He testified that there is no reason why any patient's intraocular pressure cannot be measured at any time.  He further testified that a post-cataract-surgery patient's intraocular pressure should always be measured, especially if the patient is complaining of pain.

51.     According to Dr. Dahl, the pain that Mr. Reyna reported on December 2, 1999 should be attributed to elevated intraocular pressure (or glaucoma), even though the intraocular pressure of his left eye measured normal in his three previous post-operative examinations.  In support of his assertion, Dr. Dahl noted during his testimony that Mr. Reyna's intraocular pressure was abnormally high when it was measured on February 2, 2000.  Dr. Dahl speculated that Mr. Reyna developed glaucoma through one of the four methods referenced above, but did not explain why he developed glaucoma at this point in time.

52.     Dr. Dahl testified that the VAMC's post-operative treatment fell outside the applicable standard of care to the extent that Mr. Reyna was not placed on glaucoma medications earlier, to the extent that his glaucoma was not monitored more carefully, and to the extent that other treatment should have been, but was not, instituted to correct Mr. Reyna's glaucoma.

53.      Dr. Norman testified that the intraocular pressure of Mr. Reyna's left eye was not measured on December 2, 1999 because his eye was in pain caused by tight sutures, not elevated intraocular pressure.  Dr. Norman further testified that had Mr. Reyna's pain been attributable to

elevated intraocular pressure, Mr. Reyna would have experienced nausea and vomiting, which the medical records reveal he clearly did not.

54.     Dr. Wise testified that there is nothing in Mr. Reyna's medical records that would indicate he was experiencing elevated intraocular pressure on December 2, 1999.  He also testified, consistent with Dr. Dahl's testimony, that the intraocular pressure of Mr. Reyna's left eye on February 2, 2000 (30) was insufficiently elevated to cause a CRAO.  Relatedly, Dr. Wise testified that it simply does not happen that intraocular pressure "spikes" from a relatively low point to a very high point, and then drops back to a lower point again, in a short period of time.  He testified that once one's intraocular pressure increases, it stays at a fairly high level unless treated.  Dr. Wise testified that Dr. Dahl's theory, that Mr. Reyna experienced normal intraocular pressure at least as of October 14, 1999, then experienced significantly elevated intraocular pressure – high enough to cause a CRAO – and then experienced a decrease of that intraocular pressure (to 30) after the CRAO, despite not being treated for elevated intraocular pressure, is unrealistic.

55.     Mr. Reyna's CRAO occurred within approximately two weeks of his February 3, 2000 appointment with Dr. Norman, when the CRAO was first diagnosed.  Dr. Dahl, Dr. Norman, and Dr. Wise testified that this conclusion is compelled by the fact that on February 3, 2000, Dr. Norman observed neovascularization of Mr. Reyna's iris, which typically occurs within one  week of a CRAO, and by the fact that Dr. Norman observed a cherry red spot on Mr. Reyna's retina, which typically develops within about two weeks of a CRAO.

56.     Because Mr. Reyna's CRAO likely occurred prior to his February 2, 2000 examination by Dr. Norman, and because Mr. Reyna was irreversibly blind as of the occurrence of

the CRAO, Dr. Norman would have been unable to prevent or delay the CRAO had he diagnosed it on February 2 rather than February 3.

57.     Any finding of fact that should more properly be considered a conclusion of law is hereby deemed to be a conclusion of law.

II.     Conclusions of Law

1.      This Court's jurisdiction over these consolidated actions arises under 28 U.S.C. § 1346(b), which provides, in pertinent part, that

> the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant . . . .

28 U.S.C. § 1346(b)(1).

2.      The statute establishing this Court's jurisdictional authority also acts as a choice of law provision, directing the Court to apply "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see also Flynn v. United States*, 902 F.2d 1524, 1527 (10th Cir. 1990). In this instance, Oklahoma law governs.

A.      Informed Consent

3.      Under Oklahoma law, the term "informed consent" means "an understanding decision based on adequate information about the treatment, the available alternatives, and the collateral risks." *Scott v. Bradford*, 606 P.2d 554, 556-57 (Okla. 1979).

4.      To prevail on a claim of failure to provide informed consent, a plaintiff must allege and prove: (1) the defendant physician had a *duty* to disclose one or more material risks incident to

treatment; (2) the defendant physician's failure to disclose such material risk or risks *caused* the patient injury; and (3) the patient in fact *suffered injury*. *Id.* at 558.

5.       Regarding the first of these three elements – the physician's duty to disclose – "the scope of a physician's communications must be measured by his patient's need to know enough to enable him to make an intelligent choice." *Id.* The physician is obligated to disclose only those "material risks incident to treatment." *Id.* While there is no bright-line test for determining whether a particular risk is "material," a "material" risk may be loosely defined as one "likely to affect [the] patient's decision." *Id.* "When non-disclosure of a particular risk is open to debate, the issue is for the finder of facts." *Id.*

6.       There are, however, exceptions to a physician's duty to disclose. *Id.* For example, a physician is not required to disclose risks "that either ought to be known by everyone or are already known to the patient." *Id.* Additionally, a physician is not required to fully disclose all material risks if "disclosure would be detrimental to a patient's total care and best interests . . . ." *Id.*

7.       Satisfaction of the second element – causation – requires the plaintiff to prove he "would have chosen no treatment or a different course of treatment had the alternatives and material risks of each been made known to him. . . . In other words, a causal connection exists between [the] physician's breach of the duty to disclose and [the] patient's injury when and only when disclosure of material risks incidental to treatment would have resulted in a decision against it." *Id.*

8.       Oklahoma has adopted the subjective approach to the issue of causation. *Id.* at 559. When considering the issue of causation, therefore, the finder of fact must decide whether the *plaintiff*, as opposed to a "reasonable person," would have decided against submitting to a particular

treatment or would have chosen a different course of treatment had he been fully advised of the alternatives and material risks incidental to the treatment in question.  If the plaintiff testifies that he would have submitted to the treatment even if he had been fully informed, "the trial is over." *Id.* If, on the other hand, the plaintiff testifies that he would have decided against the treatment or elected an alternative had he been fully and adequately informed, "then the causation problem must be resolved by examining the credibility of [the] plaintiff's testimony.  The [finder of fact] . . . must find [the] plaintiff would have refused the treatment if he is to prevail." *Id.*

9.      The final element of the informed consent analysis is that of injury.  *Id.*  To satisfy this final element, the plaintiff must prove the risk that was not disclosed "actually materialize[d]," *id.*, and that the plaintiff suffered injury as a consequence of submitting to the treatment.  *Id.* "Absent occurrence of the undisclosed risk, a physician's failure to reveal its possibility is not actionable." *Id.*

10.     Mr. Reyna has failed to prove, by a preponderance of the evidence, that the VAMC neglected to provide him with adequate informed consent.  Specifically, he has failed to satisfy the second and third elements of the three-part informed consent test.[12]

11.     Mr. Reyna has failed to satisfy the causation element of the informed consent test. Assuming, only for the sake of argument, that Mr. Reyna was not specifically informed that blindness was one of the risks associated with cataract surgery,[13] Mr. Reyna has nevertheless failed

---

[12]      The medical experts of both parties testified that blindness could result, though only very rarely, from  complications caused by cataract surgery.  There is little question that blindness or loss of vision is a "material risk" to the extent that such a risk was likely to affect Mr. Reyna's decision to proceed with the surgery.  His testimony supports this conclusion.  Therefore, the VAMC doctors owed Mr. Reyna a duty to disclose the risk of blindness or loss of vision.

[13]      As explained above, Mr. Reyna was in fact so informed.

to prove, by a preponderance of the evidence, that he would have rejected the proposed cataract surgery had he been so informed.  He has not, therefore, established that the purported failure to inform *caused* his blindness.[14]

12.     Mr. Reyna has likewise failed to satisfy the injury element of the informed consent test.  Although the purportedly undisclosed risk of blindness did "materialize" in the sense that Mr. Reyna lost the use of his left eye following his surgery, Mr. Reyna has not established, by a preponderance of the evidence, that his loss of vision was caused by his cataract surgery.  Because his injury did not occur "as a result of submitting to the treatment," *Scott*, 606 P.2d at 559, Mr. Reyna has not carried his burden of proof on the final element of the informed consent test.

13.     The government is entitled to judgment against Mr. Reyna on the informed consent claim.

B.     Negligence During Surgery

14.     To prevail on a claim of negligence, a plaintiff must allege and prove: (1) the defendant owed the plaintiff a duty of care to protect him from injury; (2) the defendant breached that duty by failing to exercise the requisite degree of care; and (3) the plaintiff's injury proximately resulted from the defendant's breach of the duty of care.  *McKellips v. St. Francis Hosp., Inc.*, 741 P.2d 467, 470 (Okla. 1987).

15.     "The standard of care required of those engaging in the practice of the healing arts within the State of Oklahoma shall be measured by national standards."  Okla. Stat. tit. 76, § 20.1.

---

[14]     As stated above, Mr. Reyna has also failed to prove that he would have declined to undergo the procedure had he been fully informed about Dr. Schuessler's experience and qualifications, notwithstanding her status as a resident physician.

To determine the appropriate "national" standard of care, expert medical testimony is required. *Boxberger v. Martin*, 552 P.2d 370, 373 (Okla. 1976).

16.     Regardless of how the standard of care is defined, it "does not mean that [the physician] cannot make mistakes.  Because so much of what a medical practitioner does is a matter of opinion he is not responsible for a mistake in judgment unless that mistake is so gross that it makes the professional conduct substandard."  *Boyanton v. Reif*, 798 P.2d 603, 605 (Okla. 1990) (footnote omitted).

17.     "The [finder of fact] may consider all evidence in determining whether the treating physician failed to meet the requisite standard of care."  *Boxberger*, 552 P.2d at 373-74.

18.     "The proximate cause of an event must be that which in a natural and continuous sequence, unbroken by an independent cause, produces the event and without which the event would not have occurred."  *Gaines v. Providence Apartments*, 750 P.2d 125, 126-27 (Okla. 1987).

19.     To establish that an alleged breach of the standard of care proximately caused an alleged injury, the plaintiff must prove the breach was the "cause in fact" of the injury.  *McKellips*, 741 P.2d at 470.  "Cause in fact . . . deals with the 'but for' consequences of an act.  The defendant's conduct is a cause of the event if the event would not have occurred but for that conduct."  *Id.* (internal quotation and citation omitted).  "The circumstances proved must lead to the conclusion with reasonable certainty and probability."  *Boxberger*, 552 P.2d at 374.  "Absolute certainty is not required, however, mere possibility or speculation is insufficient."  *McKellips*, 741 P.2d at 471.

20.     Mr. Reyna has failed to prove, by a preponderance of the evidence, that VAMC doctors acted negligently in the course of performing his September 1, 1999 cataract surgery. Specifically, he has failed to satisfy the second and third elements of the three-part negligence test.[15]

21.     Mr. Reyna has not carried his burden as to the breach element of the negligence test. He has not established, by a preponderance of the evidence, that either Dr. Schuessler or Dr. Walters breached the requisite duty of care owed to him during his surgery.  The decisions of Dr. Schuessler and Dr. Walters to attempt explantation of the intraocular lens by cutting the lens in two and removing it in halves, and to cut the lens using a Vannas Scissors, and the physicians' efforts to execute those decisions, simply do not, under the circumstances of this case, constitute substandard professional conduct under the applicable national standard of care.

22.     Mr. Reyna has not carried his burden as to the proximate causation element of the negligence test.  More specifically, he has not established, by a preponderance of the evidence, that his September 1, 1999 cataract surgery is the proximate cause of his injury.  The evidence presented by both parties indicates that glaucoma is not a well-recognized cause of CRAO, if indeed it is possible for glaucoma to cause a CRAO at all.  Assuming, for the sake of argument, both that glaucoma *can* cause a CRAO *and* that Mr. Reyna suffered from glaucoma before his CRAO, the inescapable fact remains that Dr. Dahl relies on pure speculation in opining that complications resulting from Mr. Reyna's cataract surgery caused his glaucoma.

23.     The government is entitled to judgment against Mr. Reyna on the negligence during surgery claim.

---

[15]     There is no dispute that the government and the VAMC, acting through Dr. Schuessler and Dr. Walters, owed Mr. Reyna a duty of care when performing cataract surgery on his left eye.

C.    Negligence in Providing Post-Operative Treatment

24.    The legal standards that apply to negligence claims in general, and which are set forth above, apply equally to acts of alleged medical negligence during an operation *and* acts of alleged medical negligence during post-operative treatment.  *See Scott*, 606 P.2d at 556 (holding the trial court did not err in refusing to separately instruct the jury on the plaintiffs' post-operative abandonment claim because the post-operative claim was governed by the court's "general instructions on negligence and proximate cause").

25.    Mr. Reyna has failed to prove, by a preponderance of the evidence, that VAMC doctors acted negligently in the course of providing post-operative treatment for his left eye following his September 1, 1999 cataract surgery.  Specifically, he has failed to satisfy the second and third elements of the three-part negligence test.[16]

26.    Mr. Reyna has not carried his burden as to the breach element of the negligence test. He has not established, by a preponderance of the evidence, that VAMC doctors breached the requisite duty of care owed to him during his post-operative treatment.  All indications from Mr. Reyna's one-day post-operative, one-week post-operative, and six-week post-operative visits compel the conclusion that the condition of Mr. Reyna's left eye was not worsening, and was perhaps even improving, in the weeks and months following his surgery, such that there was no need for any increased monitoring of the eye or any increase in the frequency of post-operative visits.  Further, Dr. Norman's failure to obtain the intraocular pressure of Mr. Reyna's left eye on December 2, 1999 does not constitute substandard professional conduct in view of the fact that Mr. Reyna's left eye

---

[16]    There is no dispute that the government and the VAMC, acting through Dr. Schuessler, Dr. Norman, and Dr. Bogie, owed Mr. Reyna a duty of care when providing post-operative treatment for his left eye following his cataract surgery.

was in too much pain due to abnormally tight sutures, which Dr. Norman ultimately removed, and because all previous intraocular pressure measurements of Mr. Reyna's left eye were normal.

27.     Mr. Reyna has not carried his burden as to the proximate causation element of the negligence test.  In other words, he has not established, by a preponderance of the evidence, that the post-operative treatment he received, or did not receive but should have received, proximately caused his injury.  The evidence presented does not indicate that VAMC doctors did anything to cause Mr. Reyna's CRAO, nor does it indicate that they could or should have done anything different to prevent the CRAO.  To the contrary, the evidence strongly suggests that until February 2, 2000, Mr. Reyna's post-operative recovery was proceeding as expected, and that the VAMC doctors monitored and treated Mr. Reyna's left eye accordingly.  On February 2, 2000, when the intraocular pressure of Mr. Reyna's left eye was for the first time determined to be elevated, the CRAO had likely already occurred; the VAMC doctors at this point were unable to prevent or lessen the severity of Mr. Reyna's injury.

28.     The government is entitled to judgment against Mr. Reyna on the negligence during post-operative treatment claim.

29.     Any conclusion of law that should more properly be considered a finding of fact is hereby deemed to be a finding of fact.

III.     Conclusion

The Court finds that Defendant, United States of America, is entitled to judgment against

Plaintiff, Rogelio Reyna, as to all claims raised in Case Nos. CIV-03-1757-M and CIV-04-221-M.

Judgment shall be entered accordingly.

**IT IS SO ORDERED this 11th day of May, 2005.**

VICKI MILES-LaGRANGE
UNITED STATES DISTRICT JUDGE